**FILED**

Nov 15 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

1  MARTHA BOERSCH (CABN 126569)
   Attorney for the United States
2  Acting under Authority Conferred by 28 U.S.C. § 515

3  NOAH STERN (CABN 297476)
   LLOYD FARNHAM (CABN 202231)
4  Assistant United States Attorneys

5       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
6       Telephone: (415) 436-7200
        FAX: (415) 436-7234
7       Noah.Stern@usdoj.gov
        Lloyd.Farnham@usdoj.gov
8
   Attorneys for United States of America
9

                    UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA
11
                      SAN FRANCISCO DIVISION
12

13  UNITED STATES OF AMERICA,              )   NO.   3:24-cr-00572 SI
                                           )
14          Plaintiff,                     )
                                           )
15      v.                                 )   DEFERRED PROSECUTION AGREEMENT
                                           )
16  CRUISE, LLC,                           )
                                           )
17          Defendant.                     )
    _____)  .
18

19

20

21

22

23

24

25

26

27

28

## DEFERRED PROSECUTION AGREEMENT

The United States Attorney's Office for the Northern District of California (the "government"), and defendant Cruise, LLC ("Cruise" or the "Company"), through its undersigned representative and attorneys and pursuant to authority granted by the Company's Board of Directors, enter into this Deferred Prosecution Agreement under the terms and conditions set forth below.

### Criminal Information and Acceptance of Responsibility

1.      Cruise acknowledges and agrees that the government will file the accompanying Information in the United States District Court for the Northern District of California charging Cruise with submitting a false report to a federal agency to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States in violation of Title 18, United States Code, Section 1519. Cruise knowingly waives any right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b).

2.      Cruise admits, accepts, and acknowledges that it is responsible under United States law for the acts of its current and former officers, employees, and agents as charged in the Information and as set forth in the Statement of Facts, attached as Attachment A and incorporated by reference into this Agreement, and that the facts alleged in the Information and described in the Statement of Facts are true and accurate. Should the government pursue the prosecution that is deferred by this Agreement, Cruise agrees that it will neither contest the admissibility of nor contradict the Statement of Facts in any such proceeding, including any trial, guilty plea, or sentencing proceeding.

3.      It is further understood that the government shall file this Agreement in a public Court file and may disclose this Agreement to the public.

### Term of the Agreement

4.      This Agreement shall have a term of three (3) years from the date on which the fully-executed Agreement is filed with the Court (the "Term"), except for specific provisions below that specify a longer period. Cruise agrees, however, that in the event the government determines, in its sole discretion, that Cruise has knowingly violated any provision of this Agreement or has failed to

1   completely perform or fulfill each of its obligations under this Agreement, an extension or extensions of

2   the Term may be imposed by the government, in its sole discretion, for up to a total additional time

3   period of one year, without prejudice to the government's right to proceed as provided in the breach

4   provisions of this Agreement below.

5          **Relevant Considerations**

6          5.     The government enters into this Agreement based on the individual facts and

7   circumstances presented by this case and by Cruise, including (a) the nature and seriousness of the

8   offense conduct; (b) Cruise's timely notification to the government of an internal investigation, and offer

9   of cooperation, after being notified by the government that it had opened an investigation; (c) Cruise's

10  ongoing cooperation described more fully below; and (d) the remedial measures and operational

11  improvements made by Cruise, described more fully below.

12         **Cooperation**

13         6.     To date, Cruise has provided cooperation, which includes (1) conducting a thorough

14  internal investigation and making the findings of that investigation public; (2) proactively identifying

15  certain issues and facts that would likely be of interest to the government; (3) making factual

16  presentations to the government and sharing information that would not have been otherwise available to

17  the government; (4) sharing certain privileged documents with the government pursuant to a limited

18  waiver of privilege; and (5) making available witnesses for interviews by the government.

19         7.     Cruise shall continue to cooperate fully with the government in any and all matters

20  relating to the conduct described in this Agreement and the attached Statement of Facts and other related

21  conduct under investigation by the government at any time during the Term, until the later of the date

22  the Term ends or the date upon which all investigations and prosecutions arising out of such conduct are

23  concluded. At the request of the government, Cruise shall also cooperate fully with other law

24  enforcement and regulatory authorities and agencies in any investigation of Cruise, its subsidiaries or

25  affiliates, or any of its present or former officers, directors, employees, agents, lobbyists and consultants,

26  or any other party, in any and all matters relating to the conduct described in this Agreement and the

27  attached Statement of Facts and other related conduct under investigation by the government at any time

28  during the Term. Cruise's cooperation pursuant to this paragraph is subject to applicable law and

1   regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine;

2   however, Cruise must provide to the government a log of any information or cooperation that is not

3   provided based on an assertion of law, regulation, privilege, or attorney work product, and Cruise bears

4   the burden of establishing the validity of any such an assertion. Cruise agrees that its cooperation shall

5   include, but not be limited to, the following:

6       a.  Cruise shall fully and truthfully cooperate in any matter in which it is called upon to

7           cooperate by a representative of the United States Attorney's Office for the Northern

8           District of California.

9       b.  Cruise shall truthfully and in a timely manner disclose all factual information with

10          respect to its activities, those of its subsidiaries and affiliates, and those of its present and

11          former directors, officers, employees, agents, lobbyists and consultants, including any

12          evidence or allegations and internal or external investigations, about which the

13          government may inquire. This obligation of truthful disclosure includes, but is not limited

14          to, the obligation of Cruise to promptly provide to the government, upon request, any

15          non-privileged document, record or other tangible evidence about which the government

16          may inquire.

17      c.  Upon request of the government, Cruise shall designate knowledgeable employees,

18          agents or attorneys to provide to the government the information and materials described

19          above on behalf of Cruise. It is further understood that Cruise must at all times provide

20          complete, truthful, and accurate information.

21      d.  With respect to any information, testimony, documents, records or other tangible

22          evidence provided to the government pursuant to this Agreement, Cruise consents to any

23          and all disclosures to other governmental authorities of such materials as the government,

24          in its sole discretion, shall deem appropriate.

25      e.  Should Cruise learn of any evidence or allegation of a violation of U.S. criminal law,

26          Cruise shall promptly report such evidence or allegation to the government. On the date

27          that the Term expires, Cruise, by its Chief Executive Officer and Chief Safety Officer,

28          will certify to the government that Cruise has met its disclosure obligations pursuant to

this Agreement. Each certification will be deemed a material statement and representation by Cruise to the executive branch of the United States for purposes of 18 U.S.C. § 1001.

8.      Cruise agrees that its obligations to cooperate under the terms set forth in this Agreement will continue even after the three-year term of this Agreement and the dismissal of the Information, and Cruise will continue to fulfill the cooperation obligations set forth in this Agreement in connection with any related investigation, criminal prosecution, or civil proceeding brought by the government related to the conduct set forth in the Information or the Statement of Facts.

**Payment of Monetary Penalty**

9.      The government and Cruise agree that a criminal monetary penalty of $500,000 shall be paid by Cruise pursuant to this Agreement.

10.     Cruise shall be responsible for paying $500,000 to the United States Treasury within 7 days of the filing of this Agreement. Nothing in the Agreement shall be deemed an agreement regarding a maximum penalty that may be imposed in any future prosecution, and the government is not precluded from arguing in any future prosecution that the Court should impose a higher fine, disgorgement or civil or criminal forfeiture, although the government agrees that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine imposed as part of a future judgment. Cruise agrees that no tax deduction may be sought in connection with the payment of any part of the fine, and Cruise may not seek to recover any portion of the fine through surcharges, fees or any other charges to customers.

11.     The government agrees, except as provided in this Agreement, that it will not bring any criminal or civil case (except for criminal tax violations, as to which the government does not make any agreement) against Cruise or any of its present or former subsidiaries or affiliates relating to any of the conduct described in the attached Statement of Facts, or to conduct otherwise disclosed to the government by Cruise in the investigation. The government, however, may use any information related to the conduct described in the attached Statement of Facts against Cruise: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; or (c) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by Cruise or any

4

1 | of its present or former parents or subsidiaries.

2 | **Remediation, Safety Compliance Program, and Reporting**

3 | 12.    Cruise affirms that it has engaged in remedial measures to enhance its safety compliance

4 | program and incident response protocols.  Remedial measures include (a) taking steps to ensure that

5 | employees identified as responsible for the conduct at issue are no longer employed by or have a

6 | relationship with Cruise; and (b) revamping the companywide safety compliance and incident response

7 | protocols, including creating a new role of Chief Safety Officer, who is required to approve all reports to

8 | regulators and who reports to the Board of the Directors; (c) establishing a cross-disciplinary regulatory

9 | team who reports directly to the CEO with Board oversight comprised of government affairs, legal,

10 | communications, engineering, and safety personnel who are all responsible for regulatory compliance;

11 | and (d) training for all employees that might interact with regulators and government officials.

12 | 13.    Cruise agrees that it will report to the government annually during the Term regarding

13 | remediation and implementation of the safety compliance and incident response protocols described in

14 | Attachment B. These reports will be prepared in accordance with Attachment C.

15 | **Deferred Prosecution**

16 | 14.    In consideration of: (a) Cruise's past and future cooperation as described above; (b)

17 | Cruise's payment of a monetary penalty of $500,000; (c) Cruise's adoption and maintenance of remedial

18 | measures, and review and audit of such measures, including the compliance undertakings described in

19 | Attachment B, the government agrees to request that the United States District Court for the Northern

20 | District of California defer proceedings on the charge in the Information pursuant to Title 18, United

21 | States Code. Section 3161(h)(2), for the Term of this Agreement.

22 | 15.    The government further agrees that if Cruise fully complies with all of its obligations

23 | under this Agreement, the government will not continue the criminal prosecution against Cruise

24 | described in Paragraph 1. Within thirty (30) days of the successful completion of the Term, the

25 | government shall seek dismissal of the Information filed against Cruise.

26 | **Breach of the Agreement**

27 | 16.    If, during the Term, (a) Cruise commits any felony under U.S. law; (b) Cruise provides in

28 | connection with this Agreement deliberately false, incomplete, or misleading information, including in

5

1  connection with a disclosure of information about individual culpability; (c) Cruise fails to implement

2  compliance and incident response protocols as set forth in this Agreement and Attachment B; or (d)

3  Cruise otherwise fails to completely perform or fulfill each of its obligations under the Agreement; or if

4  at any time Cruise fails to cooperate as set forth in this Agreement regardless of whether the government

5  becomes aware of such a breach after the Term is complete, Cruise shall thereafter be subject to

6  prosecution for any federal criminal violation of which the government has knowledge, including, but

7  not limited to, the conduct described in the attached Statement of Facts, which may be pursued by the

8  government in the U.S. District Court for the Northern District of California or any other appropriate

9  venue. Determination of whether Cruise has breached the Agreement and whether to pursue prosecution

10 of Cruise shall be in the government's sole discretion. Any such prosecution may be premised on

11 information provided by Cruise or its personnel. Any such prosecution relating to the conduct described

12 in the attached Statement of Facts or relating to conduct known to the government prior to the date on

13 which this Agreement was signed that is not time-barred by the applicable statute of limitations on the

14 date of the signing of this Agreement may be commenced against Cruise or its subsidiaries,

15 notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and

16 the expiration of the Term plus one year. Thus, by signing this Agreement, Cruise agrees that the statute

17 of limitations with respect to any such prosecution that is not time-barred on the date of the signing of

18 this Agreement shall be tolled for the Term plus one year. In addition, Cruise agrees that the statute of

19 limitations as to any violation of U.S. law that occurs during the Term will be tolled from the date upon

20 which the violation occurs until the earlier of the date upon which the government is made aware of the

21 violation or the duration of the Term plus five years, and that this period shall be excluded from any

22 calculation of time for purposes of the application of the statute of limitations.

23      17.    In the event the government determines that Cruise has breached this Agreement, the

24 government agrees to provide Cruise with notice of such breach prior to instituting any prosecution

25 resulting from such breach. Within thirty (30) days of receipt of such notice, Cruise shall have the

26 opportunity to respond to the government in writing to explain the nature and circumstances of such

27 breach, as well as the actions Cruise has taken to address and remediate the situation, which explanation

28 the government shall consider in determining whether to pursue prosecution of Cruise.

18.     In the event that the government determines that Cruise has breached this Agreement: (a) all statements made by or on behalf of Cruise or its present or former parents or subsidiaries to the government or to the Court, including the attached Statement of Facts, and any testimony given by Cruise or its present or former parents or subsidiaries before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads or evidence derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the government against Cruise or its present or former parents or subsidiaries; and (b) Cruise or its present or former parents or subsidiaries shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of Cruise or its present or former parents or subsidiaries prior or subsequent to this Agreement, or any leads or evidence derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, Cruise or its present or former parents or subsidiaries, will be imputed to Cruise for the purpose of determining whether Cruise has violated any provision of this Agreement shall be in the sole discretion of the government.

**Statements by Cruise**

19.     Cruise expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for Cruise, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by Cruise set forth above or the facts described in the attached Statement of Facts. Cruise agrees that if it or any of its present or former parents or subsidiaries issues a press release or holds any press conference in connection with this Agreement, Cruise shall first consult the government to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters relating to this Agreement; and (b) whether the government has any objection to the release. This paragraph is not intended to preclude Cruise or any of its affiliates from raising any defenses or asserting any affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that in so doing, neither Cruise nor its affiliates contradicts a statement contained in the

1    Statement of Facts.

2        **Limitations on Binding Effect of Agreement**

3        20.    This Agreement is binding on Cruise and the government but specifically does not bind

4    (a) any component of the Department of Justice other than the United States Attorney's Office for the

5    Northern District of California, (b) other federal agencies, (c) any state, local or foreign law enforcement

6    or regulatory agencies, or (d) any other authorities, although the government will bring the cooperation

7    of Cruise and its compliance with its obligations under this Agreement to the attention of such agencies

8    and authorities if requested to do so by Cruise.

9        **Changes in Corporate Form**

10       21.    Except as may otherwise be agreed by the government and Cruise in connection with a

11   particular transaction, Cruise agrees that in the event that, during the term of any of its obligations under

12   this Agreement, it undertakes any change in corporate form, including if it sells, merges, or transfers

13   business operations that are material to Cruise's consolidated operations, as they exist as of the date of

14   this Agreement, whether such change is structured as a sale, asset sale, merger, transfer, or other change

15   in corporate form, it shall include in any contract for sale, merger, transfer or other change in corporate

16   form a provision binding the purchaser, or any successor in interest thereto, to the obligations described

17   in this Agreement. The purchaser or successor in interest must also agree in writing that the

18   government's ability to determine there has been a breach under this Agreement is applicable in full

19   force to that entity. Cruise agrees that the failure to include this Agreement's breach provisions in the

20   transaction will make any such transaction null and void. Cruise shall provide notice to the government

21   at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate

22   form. The government shall notify Cruise prior to such transaction (or series of transactions) if it

23   determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement

24   purposes of this Agreement. If at any time during the Term Cruise engages in a transaction(s) that has

25   the effect of circumventing or frustrating the enforcement purposes of this Agreement, the government

26   may deem it a breach of this Agreement pursuant to the breach provisions of this Agreement. Nothing

27   herein shall restrict Cruise from indemnifying (or otherwise holding harmless) the purchaser or

28   successor in interest for penalties or other costs arising from any conduct that may have occurred prior

to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the government.

**Notice**

22.     Any notice to the government under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the Chief, Corporate and Securities Fraud Section, United States Attorney's Office, 450 Golden Gate Avenue, San Francisco, California 94102. Any notice to Cruise shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to John Potter, Quinn Emanuel Urquhart & Sullivan, LLP, 50 California Street, 22nd Floor, San Francisco, California 94102.

**Complete Agreement**

23.     This Agreement sets forth all the terms of the agreement between Cruise and the government. No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the government, the attorneys for Cruise, and a duly authorized representative of Cruise.

DATED: November 14, 2024

MARTHA BOERSCH
Attorney for the United States

NOAH STERN
LLOYD FARNHAM
Assistant United States Attorneys

**AGREED AND CONSENTED TO:**

DATED: November 14.00, 2024

Signed by:
*Craig Glidden*
CED2B03DBE924FD...
CRAIG GLIDDEN
President and Chief Administrative Officer
Cruise, LLC

DATED: November 14, 2024

JOHN POTTER
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Counsel for Cruise, LLC

9

**CORPORATE OFFICER'S CERTIFICATE**

I have read this Agreement and carefully reviewed every part of it with outside counsel for Cruise, LLC. I understand the terms of this Agreement and voluntarily agree, on behalf of Cruise, to each of its terms. Before signing this Agreement, I consulted outside counsel for Cruise. Counsel fully advised me of the rights of Cruise, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. I have carefully reviewed the terms of this Agreement with the Cruise, LLC Board of Directors. I have advised and caused outside counsel for Cruise to advise the Board of Directors fully of the rights of Cruise, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement. No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of Cruise, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am an officer of Cruise and that I have been duly authorized by Cruise to execute this Agreement on behalf of Cruise, LLC.

DATED: November ___14.00___, 2024

Signed by:

*Craig Glidden*

CED2B03DBE924FD...

CRAIG GLIDDEN
President and Chief Administrative Officer
Cruise, LLC

**CERTIFICATE OF COUNSEL**

We are counsel for Cruise, LLC in the matter covered by this Agreement. In connection with such representation, we have discussed the terms of this Agreement with the Cruise, LLC Board of Directors. Based on our review of the foregoing materials and discussions, we are of the opinion that the representative of Cruise has been duly authorized to enter into this Agreement on behalf of Cruise and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of Cruise and is a valid and binding obligation of Cruise. Further, we have carefully reviewed the terms of this Agreement with the Cruise, LLC Board of Directors and the Chief Executive Officer of Cruise, LLC. We have fully advised them of the rights of Cruise, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To our knowledge, the decision of Cruise to enter into this Agreement, based on the authorization of Cruise, LLC's Board of Directors, is an informed and voluntary one.


DATED: November __14__, 2024

JOHN POTTER
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
Counsel for Cruise, LLC

11

1 | MARTHA BOERSCH (CABN 126569)
Attorney for the United States
2 | Acting under Authority Conferred by 28 U.S.C. § 515

3

4

5 | UNITED STATES DISTRICT COURT

6 | NORTHERN DISTRICT OF CALIFORNIA

7 | SAN FRANCISCO DIVISION

8 | UNITED STATES OF AMERICA,                    )   CASE NO.
                                                )
9 |         Plaintiff,                           )   <u>VIOLATION</u>:
                                                )   18 U.S.C. § 1519 – Falsification of Records in
10 |    v.                                       )   Federal Investigation;
                                                )
11 | CRUISE, LLC,                                )
                                                )
12 |         Defendant.                          )   SAN FRANCISCO VENUE
   | _____)

13

14

15 |                         I N F O R M A T I O N

16 | The Attorney for the United States alleges:

17 | <u>COUNT ONE</u>:          (18 U.S.C. § 1519 – Falsification of Records in Federal Investigation)

18 |         On or about October 3, 2023, in the Northern District of California, the defendant,

19 |                                    CRUISE, LLC,

20 | knowingly falsified, and made a false entry in a record, document, or tangible object with the

21 | intent to impede, obstruct, or influence the investigation or proper administration of a matter

22 | within

23 | //

24 | //

25 | //

26 | //

27

28

1  the jurisdiction of a department or agency of the United States, to wit, the National Highway

2  Traffic Safety Administration within the United States Department of Transportation, in

3  violation of Title 18, United States Code, Section 1519.

4

5  DATED: November _____, 2024                    MARTHA BOERSCH
                                                   Attorney for the United States
6

7                                                  _____

8                                                  NOAH STERN
                                                   LLOYD FARNHAM
9                                                  Assistant United States Attorneys

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**ATTACHMENT A**

2

**STATEMENT OF FACTS**

3          The following Statement of Facts is incorporated by reference as part of the Deferred

4   Prosecution Agreement between the United States Attorney's Office for the Northern District of

5   California and Cruise, LLC ("Cruise" or the "Company").  Cruise hereby agrees and stipulates that the

6   following information is true and accurate.  Cruise admits and acknowledges that, for purposes of any

7   prosecution brought by the United States Attorney's Office, it is responsible for the acts of its officers,

8   directors, employees, and agents as set forth below.  Should the United States Attorney's Office pursue

9   the prosecution that is deferred by this Deferred Prosecution Agreement, the Company agrees that it will

10  neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.

11  **THE COMPANY AND ITS REGULATION BY NHTSA**

12          1.          Cruise is a private company founded in 2013 in San Francisco, California, where it

13  maintains its headquarters.  Cruise develops and operates self-driving technology and autonomous

14  vehicles ("AVs").  The company has operated or is currently operating in San Francisco, Austin, Texas,

15  Phoenix, Arizona, and elsewhere.

16          2.          Cruise's AVs are subject to federal regulations and regulatory authority, including the

17  regulatory authority of the National Highway Traffic Safety Administration ("NHTSA"), a federal

18  government agency that is part of the United States Department of Transportation, that establishes and

19  enforces federal vehicle safety regulations under the Federal Motor Vehicle Safety Standards, 49 CFR

20  Part 571.  NHTSA is charged with authority "to reduce traffic accidents and deaths and injuries resulting

21  from traffic accidents."  49 U.S.C. § 30101.  To carry out this statutory mandate, NHTSA has broad

22  information gathering authority, including authority to obtain information on vehicle crashes, potential

23  defects related to motor vehicle safety, and compliance with legal requirements to timely identify and

24  conduct recalls for safety defects.  *See*  49 U.S.C. § 30166(e), (g); 49 C.F.R. Part 510; *see also id.*

25  §§ 30118-30120.  NHTSA's statutory mandate includes authority to proactively ensure that motor

26  vehicles and motor vehicle equipment, including those with novel technologies, perform in ways that

27  "protect[] the public against unreasonable risk of accidents occurring because of design, construction, or

28

1  performance of a motor vehicle, and against unreasonable risk of death or injury in an accident." 49

2  U.S.C. § 30102(9).

**NHTSA'S STANDING GENERAL ORDER REGARDING AUTOMATED DRIVING SYSTEMS**

4      3.      Cruise's autonomous vehicle operations were subject to NHTSA's Second Amended

5  Standing General Order 2021-01 (the "SGO"), which requires incident reporting for Automated Driving

6  Systems ("ADS"). The purpose of the order is, in part, to allow NHTSA to evaluate whether specific

7  ADS manufacturers or operators are meeting their statutory obligations to ensure that their vehicles and

8  equipment are free of defects that pose an unreasonable risk to motor vehicle safety or are recalled if

9  such a safety defect is identified. NHTSA uses the information provided to it pursuant to the SGO, in

10 part, to determine whether to open defect, compliance, or crash investigations.

11     4.      Cruise was served with a copy of the SGO, triggering its obligation to report incidents,

12 including crashes involving Cruise autonomous vehicles, as required by the SGO.

13     5.      The SGO required Cruise to report certain crashes involving its vehicles that occurred

14 while the ADS is engaged, or immediately after the ADS is in use, and to provide sufficient information

15 for NHTSA to identify crashes warranting further follow up. Specifically, Cruise was required to report,

16 among other crashes, crashes that involved a pedestrian by submitting an incident report to NHTSA

17 within one calendar day of receiving notice of the crash. The SGO required Cruise to submit incident

18 reports through an online form. Among other things, the incident report was required to include "a

19 written description of the pre-crash, crash, and post-crash details." For such crashes, the SGO also

20 required Cruise to submit an updated incident report on the tenth calendar day after receipt of notice of

21 the incident.

22     6.      The SGO required Cruise to contact NHTSA if it learned that a report contained an error

23 and to identify the correction in its next report about the incident.

**THE OCTOBER 2, 2023 ACCIDENT**

25     7.      On October 2, 2023, at approximately 9:29 p.m., a Cruise autonomous vehicle with ADS

26 engaged and no human passengers was stopped at a red light at the intersection of Cyril Magnin Street

27 and Market Street in San Francisco, California. The Cruise AV was in the right lane and a Nissan,

28 driven by a human and traveling southbound in the same direction, was stopped in the left lane.

8.      When the light turned green, the Cruise AV and the Nissan proceeded southbound across Market Street, with the Nissan slightly ahead.  At the same time, a woman was walking eastbound in the crosswalk on the far-end of the intersection—against a red light and do not walk sign—and crossed in front of the path of the Cruise AV.  The woman stopped in the lane in which that the Nissan was driving because her path was blocked by oncoming vehicles.  The Nissan continued into the crosswalk without stopping and struck the woman, and the impact caused her to travel into the air and to the right, directly in front of the path of the Cruise AV.  The Cruise AV braked hard after detecting a potential collision when the Nissan struck the woman, but the AV was unable to avoid impact with the woman.  The AV struck and the woman went under the front of the AV, with the front left tire rolling over the woman and the Cruise AV coming to a complete stop with the woman under the Cruise AV in front of the left rear tire.

9.      The Cruise AV's ADS was designed to have the AV pull over to the side of the road during certain minor crashes, a maneuver that is referred to as a Minimal Risk Condition ("MRC").  While the woman was under the Cruise AV, because the AV's detection system did not detect that the woman was underneath it, the AV attempted to perform a MRC maneuver, pulling her forward approximately twenty feet and reaching a speed of approximately 7 miles per hour.  The ADS then disengaged, and the Cruise AV stopped because it detected that its left rear tire was raised off of the ground.  When the Cruise AV stopped, the woman was trapped under the Cruise AV.  As a result of the accident, the woman was seriously injured.

10.     The Nissan driver fled the scene of the accident after striking the woman.  Emergency responders arrived on scene and instructed a Cruise Remote Assistant, a human who had connected to the AV during the pullover maneuver, to keep the vehicle in place.  Emergency responders used the jaws of life to raise the AV and free the woman from underneath the AV and she was transported to a hospital.

11.     Shortly after the accident, the Cruise AV remotely offloaded a 14-second video that starts when the AV is stopped before entering the intersection and ends when the AV initially stops after hitting the pedestrian.

A-3

1  **CRUISE INCIDENT RESPONSE**

2       12.    Cruise initiated incident response procedures immediately after the crash that led to a

3  large number of employees, including Cruise's executive officers and senior leaders, being paged to

4  duty and convened in a virtual "war room." At around the same time, public media and news

5  organizations began reporting that the Cruise AV had struck a pedestrian, without any reference to the

6  Nissan's role in the accident. The Cruise incident response team focused almost exclusively on

7  correcting what Cruise management viewed to be the false media narrative. To do so, Cruise

8  screenshared the 14-second video, or a slow-motion version of the same video, with members of the

9  media and released a public statement describing the accident. At that time, the Cruise incident response

10  team and Cruise management were unaware that the pedestrian had been dragged following the

11  accident, and the public statement did not reference the MRC or the dragging of the pedestrian.

12       13.    The public statement, issued around 1:00 a.m., stated, "At approximately 9:30 p.m. on

13  October 2, a human-driven vehicle struck a pedestrian while traveling in the lane immediately to the left

14  of the Cruise AV. The initial impact was severe and launched the pedestrian directly in front of the AV.

15  The AV then braked aggressively to minimize the impact. The driver of the other vehicle fled the scene,

16  and at the request of the police the AV was kept in place."

17       14.    Cruise also began reaching out to its federal, state, and local regulators and other

18  government officials to notify them of the accident and to ensure that the regulators and officials were

19  aware that the pedestrian was first struck by a human-driven car. Similarly, Cruise informed federal

20  legislators and congressional committees about the accident. In emails that Cruise sent, or caused to be

21  sent, Cruise failed to disclose the secondary movement and dragging and, instead, emphasized that a

22  "human driver" had initially hit the woman and stated that the Cruise AV was "kept in place."

23       15.    At around 3:30 a.m., a Cruise engineer who was analyzing data and video from the AV

24  recognized that the AV had driven forward one to two car lengths with the pedestrian underneath the

25  AV, and the engineer noted this fact in a group messaging conversation related to the crash response. At

26  around 6:15 a.m., the engineer reported to Cruise's senior leadership during a Crisis Management Team

27  meeting that the AV had pulled forward approximately seven meters with the woman underneath the

28  AV.

16. At around 7:00 a.m. a 45-second video of the accident that had been offloaded from the AV was posted to an internal Slack channel. This high-resolution video depicted the Cruise AV initiating the secondary movement and dragging the woman underneath it at over seven miles per hour. After receiving the longer version of the video, Cruise's communications team continued sharing the shorter video with the media and press without showing or discussing the secondary movement or the dragging.

**CRUISE CONTACT AND COMMUNICATION WITH NHTSA**

17. During the morning of October 3, Cruise offered to brief NHTSA regarding the accident and a videoconference was scheduled for 10:30 a.m. In advance of the call, NHTSA emailed Cruise with an agenda of two topics, one of which was "Whether the Cruise ADS [automated driving system] or remote assistant could ascertain that the pedestrian was trapped under the vehicle or the location of the pedestrian on the ground." NHTSA's email requested that Cruise also submit a video of the accident. Shortly afterwards, Cruise's Chief Legal Officer, who was then unaware of the dragging, emailed NHTSA leadership the summary of the incident Cruise had distributed the previous evening, which did not mention the secondary movement or dragging.

18. At around 9:00 a.m. Cruise legal and regulatory affairs employees convened a meeting to prepare for the upcoming videoconference with NHTSA. In advance of the meeting, a senior engineer and a Cruise regulatory attorney discussed whether NHTSA should be shown the longer video depicting the dragging, or only the shorter video that ended when the Cruise AV initially stopped. The senior engineer noted that the longer video "will initiate design questions about pullover maneuvers." The regulatory attorney responded, "For sure. Concern is whether we'll be accused of hiding the ball but let's discuss." The Cruise team continued to discuss what version of the video should be shown to NHTSA and ultimately decided that the longer version should be shown to NHTSA.

19. During the prep meeting, a Cruise attorney acknowledged that the biggest issue was the AV's secondary movement, and that the secondary movement and the reasons for it would need to be explained to NHTSA. The group then discussed proposed responses explaining the reasons for the secondary movement.

20.     The Cruise team also drafted talking points for the meeting with NHTSA.  In the talking points, Cruise planned to communicate to NHTSA that it was committed to being "transparent with [NHTSA] and shar[ing] what [Cruise] know[s]."  However, despite this and Cruise's in-house counsel's acknowledgement that Cruise needed to explain the secondary movement and dragging to NHTSA, the talking point's description of the accident contained no mention of the secondary movement or the woman's dragging.  Instead, it stated that the AV "hard-braked immediately but was unable to stop before making impact with the pedestrian.  <u>The Cruise vehicle braked aggressively at .9g within 500 milliseconds of the pedestrian landing in front of it.</u>  The Cruise vehicle contacted [the Remote Assistant] immediately, and [the Remote Assistant] notified first responders.  Police arrived and instructed the Cruise vehicle not to move."  Cruise prepared a response to the question, "Why did the vehicle move after it had initially stopped," but placed this question in the section of the talking points document providing answers for NHTSA's potential questions.

21.     At around 10:30 a.m. Cruise employees including the senior engineer, attorneys, and others joined a videoconference with a team from NHTSA.  Cruise employees provided a verbal summary of the accident that did not include the secondary movement.  A senior engineer shared his screen to display video from the accident.  The senior engineer showed NHTSA the video footage depicting the run up to the accident up until the time that the Cruise AV initially stopped after striking the pedestrian.  NHTSA was not shown the remainder of the footage, including the dragging.  The senior engineer had technical issues in displaying the video, and other Cruise employees on the call realized that these technical issues prevented the NHTSA team from seeing the complete video. On one occasion, he paused the video to answer questions and did not continue playing the video.  NHTSA was not shown the secondary movement and dragging during the meeting, nor did any Cruise employee inform NHTSA of the dragging during the call.

22.     Despite the fact that NHTSA's second agenda item was whether the ADS or remote assistant could ascertain that the pedestrian was trapped under the AV, and on the video call NHTSA asked whether, after impact, the AV classified the woman as an object or human, Cruise employees on the videoconference told NHTSA that both the remote assistant and the AV's sensors detected that the pedestrian was trapped, but did not disclose that despite this the AV had initiated the secondary

1    movement while the woman was under the vehicle.  In response to a question regarding whether first

2    responders could immediately move the vehicle, the senior engineer responded that, because the

3    pedestrian was under the AV, the last thing you'd want to do is move, failing to disclose that the AV had

4    in fact initiated a maneuver and drove approximately twenty feet while the woman was under the

5    vehicle.  Complete responses to these questions would have included acknowledgement of the secondary

6    movement.

7         23.     Further, NHTSA asked Cruise what its threshold was at which it would pause operations.

8    A Cruise regulatory attorney responded that Cruise would consider a pause if there was a concern about

9    AV behavior.  NHTSA asked how quickly Cruise knew the incident was not related to AV behavior.  A

10   Cruise employee responded that Cruise knew this in the first several hours, but failed to disclose the

11   secondary movement and the dragging, an issue related to AV behavior during which the AV did not

12   recognize a human was underneath it and then dragged that human approximately twenty feet (and

13   which ultimately resulted in Cruise initiating a voluntary recall).

14        24.     Cruise's management team, and the members of the incident response team on the call

15   with NHTSA, knew that how the Cruise AV behaved before, during, and after the accident involved

16   serious injury to the pedestrian was important to NHTSA.  Cruise's failure to disclose that the AV

17   dragged the pedestrian during this NHTSA meeting had the tendency to influence the proper

18   administration of the matter.  At approximately 1:40 p.m., Cruise submitted a copy of the 45-second

19   video that depicted the dragging of the pedestrian to NHTSA.

20        25.     At around 11:30 a.m., Cruise held an in-person and videoconference meeting with

21   officials with the California Department of Motor Vehicles ("DMV") and the California Highway

22   Patrol.  During that meeting the senior engineer again had technical difficulties playing the video and

23   nobody from the state government saw the AV's secondary movement and dragging of the woman.

24   Cruise also did not tell the California DMV about the dragging or the secondary movement.  During this

25   meeting, Cruise failed to disclose the dragging and secondary movement.

26        26.     At around 12:30 p.m., the Cruise regulatory attorney who had participated in the NHTSA

27   meeting recognized the "Bigger concern is that no regulator has really clued in that we moved after

28   rolling over the pedestrian."  Despite this acknowledgment, about ten minutes later, the regulatory

1    attorney approved a 1-day-report due to NHTSA pursuant to the SGO which specifically required "a

2    written description of the pre-crash, crash, and post-crash details." The narrative omitted the fact that the

3    AV had initiated a secondary movement and driven forward approximately 20 feet, reaching a speed of

4    approximately seven miles per hour while dragging the woman underneath the AV.   That omission

5    rendered the report inaccurate and incomplete in light of the SGO, which required Cruise to disclose

6    aspects of the accident. The narrative stated, in part, "the Nissan Sentra made contact with the

7    pedestrian, launching the pedestrian in front of the AV.  The AV braked aggressively but, shortly

8    thereafter, made contact with the pedestrian.  This caused no damage to the AV.  The driver of the

9    Nissan Sentra left the scene shortly after the collision.  Police and Emergency Medical Services (EMS)

10   were called to the scene.  The pedestrian was transported by EMS."  Instead, it directed focus to the

11   action of the other driver leaving the scene after the accident.  The Cruise regulatory attorney approved

12   this narrative despite the fact that the narrative was clearly required to contain "crash, and post-crash

13   details."

14          27.     At around 2:30 p.m., Cruise submitted the 1-day-report for the accident to NHTSA.  The

15   narrative was, in substance, the same as what the Cruise regulatory attorney approved earlier in the

16   afternoon.

17          28.     At around 3:30 p.m., Cruise held a virtual meeting with SF MTA, SFPD, and SFFD.

18   Cruise showed the entire 45-second video during this meeting without technical difficulties and the

19   government officials observed the secondary movement and dragging and asked Cruise a number of

20   questions about the dragging, which Cruise answered.

21          29.     On October 5, 2023, a Forbes reporter informed Cruise that a San Francisco elected

22   official told him that the woman was dragged 20 feet or more by the Cruise AV resulting in more

23   grievous injuries to the victim and requested to see the video to get clarity on exactly what happened.

24   Cruise executives questioned how San Francisco officials had "leak[ed]" information regarding the

25   dragging and made efforts to identify the source of the "leak."  Cruise declined to share the video with

26   the Forbes reporter and told him that Cruise had nothing more to add beyond its original statement

27   which did not reference the secondary movement and dragging.

28

30.    On October 11, 2023, Cruise submitted a 10-day-report to NHTSA regarding the accident.  The narrative contained the same false description of the accident as the 1-day-report.

31.    On October 24, 2023, the DMV suspended Cruise's driverless permit, in part, on grounds that Cruise had misled the DMV about the accident.  In response to the suspension, Cruise claimed in statements to the public and Congressional offices that it had "shared the complete video of the incident with our regulators and investigators within 24 hours" when Cruise had provided the complete video only to NHTSA within 24 hours.

32.    On November 3, 2023, Cruise submitted a 30-day-report to NHTSA that disclosed the secondary movement and pedestrian dragging.

**THE 1-DAY AND 10-DAY REPORTS HAD THE TENDENCY TO INFLUENCE NHTSA**

33.    NHTSA has the authority to institute investigations of incidents in its jurisdiction, including accidents involving ADS such as those used by Cruise, and in fact, in mid-October NHTSA opened an investigation regarding the October 2, 2023 crash to determine whether a product recall or other corrected and remedial actions was warranted.  The statements and documents described above were misleading and inaccurate and had the tendency to influence the administration of NHTSA's oversight and regulation of AVs, including whether NHTSA would initiate an investigation regarding the crash and the scope of such investigation.

**ATTACHMENT B**

**SAFETY COMPLIANCE PROGRAM**

Recognizing the remedial measures undertaken by Cruise, LLC as described in the Deferred Prosecution Agreement, Cruise agrees to continue to conduct, in a manner consistent with all of the obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures regarding compliance with United States federal laws and regulations relating to Automated Driving Systems ("ADS") and highway and traffic safety.

Where necessary and appropriate, Cruise agrees to adopt new, or to modify its internal controls, policies, and procedures to ensure that it maintains an effective compliance program regarding safety compliance, including appropriate incident response protocols. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of Cruise's existing internal controls, policies, and procedures related to safety compliance:

High Level Commitment to Safety Compliance

1.    Cruise will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its safety policies and procedures regarding compliance with federal laws and regulations relating to ADS and highway and traffic safety, including the full and timely disclosure of information required by law of information about its ADS and any incidents that must be reported by law, regulation or order.

Policies and Procedures

2.    Cruise will develop and promulgate a clearly articulated and visible safety policy regarding compliance with federal laws and regulations relating to ADS and highway and traffic safety, which policy shall be memorialized in a written safety compliance code.

3.    Cruise will develop and promulgate compliance policies and procedures and appropriate incident response protocols designed to prevent violations of law in the reporting of incidents and other information required to be reported to federal regulators, including the National Highway Traffic Safety Administration, and Cruise will take appropriate measures to encourage and support the observance of accurate and timely government reporting in compliance with its regulatory obligations by personnel at all levels of Cruise. These policies and procedures shall apply to all directors, officers, and employees

1   and, where necessary and appropriate, outside parties acting on behalf of Cruise, including, but not

2   limited to, agents, consultants, lobbyists, and joint venture partners.

3          Periodic Risk-Based Review

4         4.      Cruise will develop these safety compliance policies and procedures and incident

5   response protocols on the basis of a periodic risk assessment addressing the individual circumstances of

6   Cruise.

7         5.      Cruise shall review these policies and procedures no less than annually and update them

8   as appropriate to ensure their continued effectiveness, taking into account relevant developments in the

9   field and evolving international and industry standards.

10         Proper Oversight and Independence

11        6.      Cruise will assign responsibility to one or more senior corporate executives of Cruise for

12   the implementation and oversight of the Company's safety compliance policies and procedures and

13   incident response protocols to ensure compliance with federal laws and regulations relating to ADS and

14   highway and traffic safety. Such corporate official(s) shall have the authority to report directly to

15   independent monitoring bodies, including internal audit, Cruise's Board of Directors, or any appropriate

16   committee of the Board of Directors, and shall have an adequate level of autonomy from management as

17   well as sufficient resources and authority to maintain such autonomy.

18         Training and Guidance

19        7.      Cruise will implement mechanisms designed to ensure that its safety compliance policies

20   and procedures are effectively communicated to all directors, officers, employees, and, where

21   appropriate, agents and business partners including consultants and lobbyists. These mechanisms shall

22   include: (a) periodic training for all directors and officers, all employees in positions of leadership or

23   trust, all employees in a position to interact with government officials, other positions that require such

24   training (e.g., legal, regulatory compliance, communications, and government relations), and, where

25   appropriate, agents and business partners including consultants and lobbyists; and (b) corresponding

26   certifications by all such directors, officers, employees, agents, and business partners certifying

27   compliance with the training requirements.

28        8.      Cruise will maintain, or where necessary establish, an effective system for providing

guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners including consultants and lobbyists, on complying with Cruise's incident response protocols, safety compliance policies and procedures, including when they need advice on an urgent basis.

Monitoring and Testing

9.      Cruise will conduct periodic reviews and testing of its safety compliance policies and procedures and incident response protocols designed to evaluate and improve their effectiveness in preventing violations of law in the reporting of incidents and other information required to be reported to federal regulators, taking into account relevant developments in the field and evolving industry standards.

**ATTACHMENT C**

**REPORTING REQUIREMENTS**

Cruise, LLC agrees that it will report to the U.S. Attorney's Office for the Northern District of California (the "government") periodically, at no less than twelve-month intervals during the three-year term of the Deferred Prosecution Agreement, regarding remediation and implementation of the safety compliance program and incident response protocols described in Attachment B. During this three-year period, Cruise shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

1.      By no later than one year from the date this Agreement is executed, Cruise shall submit to the government a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve its incident response protocols, internal controls, policies, and procedures for ensuring compliance with federal laws and regulations relating to Automated Driving Systems ("ADS") and highway and traffic safety, and the proposed scope of the subsequent reviews. The report shall be transmitted to:

> Chief, Corporate and Securities Fraud Section
> U.S. Attorney's Office for the Northern District of California
> 450 Golden Gate Avenue, 11th Floor
> San Francisco, CA 94102

2.      Cruise shall undertake at least two follow-up reviews and reports, incorporating the views of the government on its prior reviews and reports, to further monitor and assess whether its policies and procedures are reasonably designed to ensure compliance with federal laws and regulations relating to Automated Driving Systems ("ADS") and highway and traffic safety.

3.      The first follow-up review and report shall be completed by no later than one year after the initial report is submitted to the government. The second follow-up review and report shall be completed and delivered to the government no later than thirty days before the end of the Term.

4.      The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain

C-1

1 | and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the

2 | extent that the government determines in its sole discretion that disclosure would be in furtherance of the

3 | government's discharge of its duties and responsibilities or is otherwise required by law.

4 |      5.     Cruise may extend the time period for submission of any of the follow-up reports with

5 | prior written approval of the government.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28